**CASTROL INC., Plaintiff,**

v.

**PENNZOIL COMPANY and Pennzoil Products Company, Defendants.**

**Civ. A. No. 92–1364.**

United States District Court, D. New Jersey.

May 26, 1992.

As Amended July 24, 1992.

Anne M. Patterson, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., and Lewis R. Clayton, Robert A. Atkins, Peter B. Bensinger, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff.

Michael R. Griffinger, John A. Ridley, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., and James E. Maloney, George T. Shipley, Paul R. Elliott, Baker & Botts, Houston, Tex., for defendants.

## OPINION

WOLIN, District Judge.

In this action, Castrol Inc. ("Castrol") has sued Pennzoil Company and Pennzoil Products Company ("Pennzoil") for false and misleading representations of fact disseminated in commercial advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Castrol further asserts that Pennzoil's media campaign violates the Consumer Fraud Act of the State of New Jersey, N.J.S.A. 56:8–2 and Common Law Unfair Competition. Castrol seeks a permanent injunction to enjoin Pennzoil from broadcasting, publishing or disseminating, in any form, or in any medium, the commercials or claims Castrol contends falsely describe or represent Pennzoil's motor oil products. Additionally, Castrol seeks compensatory and punitive damages, and reasonable attorneys fees.

The Court has jurisdiction under 28 U.S.C. §§ 1332 and 1338 as to the claims brought pursuant to the Lanham Act, and has supplemental jurisdiction over the claims arising under the New Jersey Consumer Fraud Act and under common law unfair competition. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

Suit was instituted on March 31, 1992 by Verified Complaint, and Castrol's application for a temporary restraining order was denied on April 8, 1992. Castrol's motion for a preliminary injunction was consolidated with a trial on the merits. *See* Fed. R.Civ.P. 65(a)(2). The merits trial began on April 27, 1992, and concluded on May 4, 1992. The Court heard testimony from ten witnesses. Castrol presented no testimony on monetary damages. Therefore, no monetary relief was considered and is deemed waived by Castrol.

Castrol and Pennzoil are two of the major motor oil companies who manufacture and distribute their products in the United States. Competition for market share is keen, especially among the do-it-yourself segment of the public. Each of these motor oil companies engages in extensive advertising campaigns and closely monitors the other's media output. At the core of this dispute, is Pennzoil's television and print advertising campaign that states Pennzoil "outperforms any leading motor oil against viscosity breakdown." Closely coupled with Pennzoil's viscosity breakdown claim are related claims that pertain to "engine failure and premature engine wear, longer engine life and better engine protection." The television media campaign which began on or about February 15, 1992, features C.G. "Chuck" Rider, Bill Ingle and Michael Waltrip, all associated with a Nascar race team, John Andretti, Indy Car Race Team driver, and Arnold Palmer, a luminary of professional golf. Similar claims of superiority are disseminated through Pennzoil's print campaign.

## I. THE TELEVISION COMMERCIALS

Each of the television commercials features an individual associated with professional sports. Four of them feature individuals well known to professional race car competition. In the fifth, Arnold Palmer a professional golfer who has a long association with Pennzoil and currently competes on the professional golf tour, is a spokesman for Pennzoil. In each of these celebrity commercials, the phrase "outperforms any leading motor oil against viscosity breakdown" is flashed across the television screen after the celebrity has introduced the product and proclaimed its superiority. Accompanying the alleged offending claim is a Pennzoil trademark in the lower right-hand corner of the screen.

### A. C.G. "Chuck" Rider—Owner

In this commercial, Rider conveys to the viewer that viscosity breakdown would mean to him "engine failure ... and with Pennzoil he does not have that problem."

### B. Bill Ingle—Crew Chief

Ingle contends that viscosity breakdown can cause "engine failure and premature engine wear ... and with Pennzoil that is a problem that you don't have to worry about."

### C. John Andretti—Driver

Andretti asserts that "longer engine life and better engine protection are definitely two things you can expect out of Pennzoil."

### D. Michael Waltrip—Driver

Because Waltrip drives a race car for a living, he "depends on the parts and pieces in his car ... and [he feels] confident knowing that Pennzoil is protecting the moving parts inside of his engine."

### E. Arnold Palmer

Palmer confides that in his youth his family, "not being [from] a very wealthy family [his family] had to take very good care of its equipment ... so that it lasted a long time and that's why they used Pennzoil."

### II. CASTROL'S CONTENTIONS

The following paragraphs taken from Castrol's Verified Complaint succinctly summarize Castrol's contentions:

8. In a series of five television commercials, and in other media, Pennzoil makes the following representation about its products: 'Pennzoil outperforms any leading motor oil against viscosity breakdown.' This claim of product superiority is false on its face. When compared to Castrol motor oils, Pennzoil's motor oils do not provide superior protection against viscosity breakdown. Castrol motor oils equal or exceed Pennzoil's products according to every industry standard of viscosity breakdown. In fact, in industry approved laboratory tests, two of Pennzoil's three leading brands of motor oil failed even to pass the most demanding test of viscosity breakdown protection.

9. In addition, Pennzoil's television commercials convey the false and misleading message that, because of Pennzoil's purported viscosity breakdown advantage, Pennzoil motor oils prevent 'engine failure' better than other motor oils and afford customers 'longer engine life' and 'better engine protection' than other motor oils. These claims are baseless. There is no proof that consumers run any risk of suffering engine failure or shorter engine life if they use a motor oil other than Pennzoil.

10. Pennzoil's television commercials are false, misleading and deceptive, in violation of federal and New Jersey law. Castrol seeks an injunction prohibiting defendants from broadcasting the Pennzoil television commercials at issue or from making similar claims in any medium.

### III. PENNZOIL'S CONTENTIONS

Pennzoil denies that its primary message "outperforms any leading motor oil against viscosity breakdown" is literally false. Likewise, it asserts that the secondary message associated with engine failure, premature engine wear, longer engine life and better engine protection is true.

In support of its contentions, Pennzoil relies on an industry recognized test referred to as ASTM D–3945.[1] This test measures viscosity breakdown and its results are reported in terms of percent viscosity loss. Because Pennzoil motor oils report a lesser percent of viscosity loss than other major motor oils, it reasons that its media statements are true and do not violate the Lanham Act.

With regard to Pennzoil's engine wear and engine protection claims of superiority, Pennzoil asserts that less permanent viscosity breakdown and its exclusive use of

---

1. ASTM D–3945 is promulgated by the American Society for Testing and Materials ("ASTM").

the "star" polymer provide greater protection against engine wear.

## IV.  BACKGROUND FACTS

By way of background, the Court accepts as true designated paragraphs of the Verified Complaint, trial stipulations and trial testimony, which the Court deems undisputed between the parties.

### A.  *The Function of a Motor Oil in a Passenger Car*

Motor oil in a passenger car primarily functions to lubricate the moving metal parts inside the car's engine in order to limit metal-to-metal contact. An oil performs this function by providing a protective film between metal parts. Modern multi-grade motor oils are designed to have adequate resistance to flow to maintain the oil's thickness and protective film across the wide range of temperatures and stress experienced in an engine. The measure of a motor oil's resistance to flow is known as "viscosity." (Verified Complaint ¶ 11).

Multi-grade motor oils are chemically formulated to provide sufficient viscosity at high temperatures so that the oil's protective film does not become too thin. The viscosity of motor oils is enhanced by chemical additives, often referred to as Viscosity Index Improvers. (Verified Complaint ¶ 12).

To ensure that a motor oil maintains its protective film thickness in use, its viscosity must remain at an adequate level under the extreme stress exerted on the oil when it passes between metal engine parts during operation. This stress creates a "shearing" effect which can break down the level of an oil's viscosity during actual engine use. (Verified Complaint ¶ 13).

The viscosity of motor oils is measured and analyzed according to several well-established tests and specifications in the motor oil and automobile industries. Tests exist for measuring the viscosity of fresh, unused oil and for measuring the viscosity of oils that have been exposed to shearing and high temperature. (Verified Complaint ¶ 14).

### B.  *The SAE Grading System*

The Society of Automotive Engineers (the "SAE") classifies all passenger car motor oils according to a viscosity grading system known as SAE J300. Pursuant to SAE J300, the viscosities of unused, and thus unsheared, motor oils are measured using a test procedure developed by the American Society for Testing and Materials known as ASTM D–445. The ASTM D–445 test is an industry-recognized laboratory test that measures the "kinematic viscosity" of motor oils in units called "centistokes" (cSt) according to the rate at which a given motor oil flows through a thin glass tube, or capillary, at 100°C. (Verified Complaint ¶ 15).

With respect to high temperature performance, SAE J300 classifies motor oils into several grades according to the following viscosity ranges:

| SAE Grade | Viscosity (cSt) | |
|---|---|---|
| | Minimum | Maximum |
| 20 | 5.6 | 9.3 |
| 30 | 9.3 | 12.5 |
| 40 | 12.5 | 16.3 |
| 50 | 16.3 | 21.9 |

The grade designations found on multi-grade motor oils—such as 5W–30, 10W–30 and 10W–40—are derived from the J300 standard, and refer to the oil's measured viscosity at specified low and high temperatures. (Verified Complaint ¶ 16).

SAE J300 is a "pass/fail" standard. An oil is not rated any higher because its viscosity measures higher within the grade ranges. Therefore, a new 5W–30 or 10W–30 motor oil must have a viscosity of at least 9.3 cSt and a new 10W–40 motor oil must have a viscosity of at least 12.5 cSt. (Verified Complaint ¶ 17).

All Castrol and Pennzoil passenger car motor oils pass the SAE J300 standards for their specified grades, as do Quaker State, Valvoline and Texaco motor oils. In no respect are Pennzoil motor oils superior to Castrol motor oils according to SAE J300. (Verified Complaint ¶ 18).

### C.  *Viscosity Breakdown*

The phenomena of "viscosity breakdown" as the phrase is used in the motor

oil and automotive industries refers to the reduced level of a motor oil's viscosity in engine service. A permanent viscosity breakdown reflects a permanent viscosity loss usually associated with Polymer molecular breakdown. High temperature/high shear viscosity breakdown is viewed as a temporary viscosity loss since the polymer molecular structure reverts back to its original shape when the shear force is reduced.

### D. Viscosity Breakdown Tests and Standards

Tests and specifications have been developed to measure the breakdown in a motor oil's viscosity caused by the stress of shearing and high temperatures experienced during engine use. (Verified Complaint ¶ 19).

Viscosity breakdown tests and specifications have been promulgated by both automobile and motor oil industry organizations, as well as by individual auto makers. The most demanding viscosity breakdown standards have been established by the Committee of Common Market Automobile Constructors, or "CCMC." The CCMC is an association of the major European automobile manufacturers, including Mercedes–Benz, BMW and Jaguar. (The CCMC recently reorganized itself into the Association of European Automobile Constructors, or "ACEA"). (Verified Complaint ¶ 20).

The CCMC motor oil specifications contain two viscosity breakdown requirements. A motor oil must satisfy both of these viscosity breakdown requirements in order to meet CCMC specifications. They are the "Shear Stability" or "Stay-in-Grade" requirement and the "High Temperature/High Shear Viscosity" or "HTHS" requirement. (Verified Complaint ¶ 21). Other organizations have developed similar standards.

### 1. The Stay-in-Grade Requirement

#### (a) The CCMC Standard

The CCMC "Shear Stability" or "Stay-in-Grade" test measures an oil's viscosity before and after it has been subjected to shearing in the same manner as prescribed by SAE J300. The Stay-in-Grade specification requires that motor oils, after being sheared, must still maintain the minimum kinematic viscosity level required to stay within the SAE J300 grade classification established for new oil. The industry-recognized laboratory test prescribed by the CCMC for shearing the oil to determine whether it stays in grade is known as CEC L–14–A–78. To meet this Stay-in-Grade standard, for example, 5W–30 and 10W–30 oils must still measure at least 9.3 cSt, and 10W–40 oils must still measure at least 12.5 cSt after being sheared. Like SAE J300, the Stay-in-Grade standard is a "pass/fail" standard.

There is no industry standard or specification that ranks motor oils higher than others on the basis of a higher after shear kinematic viscosity within the SAE J300 grade.

#### (b) The International Lubricant Standardization and Approval Committee ("ILSAC") Standard

Through ILSAC, the Motor Vehicle Manufacturers Association of the United States, Inc. and the Japan Automobile Manufacturers Association, Inc. have jointly developed and approved performance standards for gasoline-fueled passenger car engine oils. The test procedure prescribed by ILSAC for determining whether a motor oil stays in grade after shearing is known as the "L–38" test. The L–38 test is an industry-recognized fired-engine laboratory test method for measuring changes in kinematic viscosity, among other things.

#### (c) The United States Department of Defense ("DOD") Standard

The DOD established motor oil specifications for internal combustion engines used in the United States military (the "Military Specification"). The Military Specification was in effect until October 1991, and required that motor oils meet the Stay-in-Grade standard after shearing in the L–38 test.

#### (d) The Chrysler Motors Corporation ("Chrysler") Standard

Chrysler established passenger car motor oil performance specifications which, until February 8, 1991, required that motor oils meet the Stay-in-Grade standard after shearing in an industry-recognized test procedure known as ASTM D-3945. As noted below, Chrysler now employs an HTHS standard.

2. The HTHS Requirement

(a) *The CCMC Standard*

The "High Temperature/High Shear Viscosity" or "HTHS" test measures an oil's viscosity during exposure to high temperature and shear conditions, like the environment in an operating engine where viscosity is important. The HTHS specification requires that motor oils retain a certain level of viscosity, measured in units called "centipoise" ("cP"), using a widely recognized laboratory test procedure. In order to meet this viscosity breakdown standard, all 5W–30, 10W–30 and 10W–40 motor oils must measure at least 3.5 cP.

(b) *The ILSAC Standard*

The ILSAC engine oil performance standards require that motor oils measure at least 2.9 cP under HTHS conditions.

(c) *The Chrysler and Ford Motor Company Standard*

Chrysler and Ford motor oil performance specifications now in effect require that 5W–30, 10W–30 and 10W–40 motor oils measure at least 2.9 cP under HTHS conditions or 2.6 cP under HTHS conditions after first being sheared according to ASTM D-3945.

(d) *The General Motors Company ("GM") Standard*

The GM passenger car motor oil performance specifications require that 5W–30 and 10W–30 motor oils measure at least 2.7 cP under HTHS conditions.

(e) *The SAE Standard*

Reflecting the broad consensus in the motor oil and automotive industries on the significance of HTHS, in February 1992, the SAE amended SAE J300 to include a minimum HTHS requirement for all multi-grade oils. Castrol and Pennzoil voted in favor of this amendment. The amended SAE J300 requires that 5W–30, 10W–30 and 10W–40 motor oils have an HTHS viscosity of 2.9 cP. The SAE J300 requirement does not become effective until 1993.

CEC L–36–A–90 is an industry-recognized laboratory test method for measuring the HTHS viscosity of motor oils and one of the HTHS test methods prescribed by SAE J300 and the CCMC, ILSAC, Ford and GM motor oil performance specifications.

E. *Comparative Results of Stay-in-Grade and HTHS Tests of Pennzoil and Castrol Motor Oils*

1. Stay-in-Grade

Castrol and Pennzoil motor oils all meet the Stay-in-Grade standard contained in these industry specifications. According to tests commissioned by both Castrol and Pennzoil, Pennzoil does not outperform Castrol against the Stay-in-Grade viscosity breakdown standard.

Between October 25, 1991 and February 26, 1992, the Castrol Technical Center conducted tests in accordance with CEC L–14–A–78, the test method prescribed by the CCMC Stay-in-Grade specification. Multiple samples of Castrol GTX 5W–30, 10W–30 and 10W–40 motor oils and Pennzoil Multi–Vis 5W–30, 10W–30 and 10W–40 motor oils were tested. After being sheared, the Castrol and Pennzoil motor oils tested all stayed within their grade classifications as prescribed by SAE J300.

On Castrol's behalf, Southwest Research Institute ("SwRI"), a not-for-profit independent motor oil testing facility, tested samples of Castrol GTX 10W–30 motor oil and Pennzoil Multi–Vis 10W–30 motor oil in accordance with L–38, the test method prescribed by the ILSAC and Military Specification Stay-in-Grade standards. In March 1992, EG & G Automotive Research ("EG & G"), an independent laboratory and testing company, tested another sample of Pennzoil Multi–Vis 10W–30 motor oil in

accordance with L–38 at Castrol's request. Both Castrol and Pennzoil 10W–30 motor oils stayed in grade after 10 hours during these L–38 tests.

At the request of Pennzoil, Alpha Maintenance Systems, an independent testing facility, performed tests on coded motor oil samples using CEC L–14–A–88, a subsequent revision of the test method prescribed by the CCMC Stay-in-Grade specification. These test results also demonstrate that Castrol GTX and Pennzoil Multi-Vis 5W–30, 10W–30 and 10W–40 motor oils meet the Stay-in-Grade standard of the CCMC.

Also at the request of Pennzoil, Savant, Inc., an independent motor oil testing facility, tested coded motor oil samples using ASTM D–3945, the test method prescribed by the Chrysler Stay-in-Grade specification that was in effect until February 8, 1991. These test results also show that Castrol GTX and Pennzoil Multi-Vis 5W–30, 10W–30 and 10W–40 motor oils all meet the Stay-in-Grade standard. Additional tests conducted for Pennzoil by Savant, Inc. establish that Castrol and Pennzoil 20W–50 oils also meet the Stay-in-Grade standard.

### 2. The HTHS

Between January 1, 1992 and March 25, 1992, the Castrol Technical Center conducted tests in accordance with CEC L–36–A–90 on multiple samples of Castrol GTX 5W–30, 10W–30 and 10W–40 motor oils and of Pennzoil Multi-Vis 5W–30, 10W–30 and 10W–40 motor oils. Castrol 5W–30, 10W–30 and 10W–40 motor oils all meet or exceed the 3.5 cP HTHS standard established by the CCMC, as well as all the other HTHS specifications. Pennzoil's 5W–30 and 10W–30 motor oils, however, both fail to meet the 3.5 cP HTHS standard of the CCMC, although they do pass the other HTHS specifications.

### F. *ASTM D–3945*

ASTM D–3945, and its European counterpart CEC L–14–A–88, are industry-recognized laboratory test methods for measuring percent viscosity loss and kinematic viscosity after shearing of the oil. ASTM D–3945 sets forth two procedures for shearing motor oil in fuel injector nozzles and then measuring the oil's after shear kinematic viscosity according to ASTM D–445. The ASTM D–3945 test protocol calls for a report of the before shear kinematic viscosity at 100°C; the after shear kinematic viscosity at 100°C; and the percent viscosity loss.

ASTM D–3945 test procedure A is technically identical to the European CEC L–14–A–88 shear test procedure, and is based on 30 passes of the oil under pressure through a diesel injector nozzle. ASTM D–3945 test procedure B is called the Fuel Injector Shear Stability Test and is based on 20 passes of the oil under pressure through a fuel injector nozzle. Automobile engines do not have fuel or diesel injector nozzles.

The ASTM D–3945 viscosity breakdown results are reported in terms of percent viscosity loss. ASTM D–3945 is not a standard or specification of viscosity breakdown. Percent viscosity loss reported in accordance with ASTM D–3945 is not recognized in either the motor oil or automotive industries as a standard of viscosity breakdown. ASTM D–3945 was not adopted as a viscosity breakdown standard nor has it ever been used as a viscosity breakdown standard. In fact, ASTM does not set motor oil viscosity performance standards or specifications.

The test methods set forth in ASTM D–3945 are not intended to predict viscosity loss in field service for different polymer classes or for different field equipment.

### G. *Other Tests*

In addition to the tests that have been mentioned, other L–38 and automobile fleet tests were concluded.

### 1. The L–38 Test

Castrol commissioned three L–38 engine tests, an industry-approved stay-in-grade test, to measure the permanent viscosity loss and after shear kinematic viscosity of Castrol and Pennzoil 10W–30 motor oils. As previously mentioned, these tests were

conducted at two independent motor oil testing facilities, the SwRI and EG & G.

Pennzoil itself commissioned an L-38 test at a third independent testing company, AutoResearch Laboratories, Inc. ("ALI"), which confirmed the SwRI and EG & G results.

All the L-38 test results show that after 40 hours, Castrol 10W-30 has a higher after shear kinematic viscosity than Pennzoil 10W-30 and that Castrol does not experience a significant percent permanent viscosity loss when compared to Pennzoil. The results were tabulated as follows:

| Motor Oil | Lab | After Shear Viscosity (cSt) | Percent Viscosity Loss |
|---|---|---|---|
| Castrol | SwRI | 12.05 | .9% |
| Pennzoil | EG & G | 11.53 | .7% |
| Pennzoil | SwRI | 11.15 | .4% |
| Pennzoil | ALI | 10.46 | 3.8% |

#### 2. Fleet Tests

This is also a Stay-in-Grade test. In or about December 1991 and January 1992, the Southwest Research Institute conducted an automobile fleet test at Castrol's request in order to measure the permanent viscosity loss of Pennzoil Multi-Vis 10W-30 motor oil and Castrol 10W-30 GTX motor oil in on-the-road automobile service.

The test was run under highway conditions. Castrol's expert, Paul Bennett, who had extensive experience in fleet testing at General Motors, Cummins (the world's largest diesel engine manufacturer) and Rohm & Haas (the world's largest VI Improver manufacturer), testified that the Southwest fleet test protocol was reasonable and that the test results were valid. He noted that the test was run under highway conditions that minimized fuel dilution. The test used three different car models and two cars of each model. This allowed for a variety of engines and for a crossover design. For example, oil A was run in the first GM car for 1,500 miles and then a new sample of the same oil A was run in the second GM car 1,500 miles. Mr. Bennett testified that he did not see any unusual results indicating that the car engines or the different makes and models of the cars were affecting the viscosity measurements.

For each of the three different makes of cars used in the fleet test, Castrol achieved a higher level of after shear kinematic viscosity than Pennzoil at every distance at which viscosity was measured. An average of all the fleet test results shows that Pennzoil did not outperform Castrol:

| Kinematic Viscosity (cSt) at Various Intervals | | | | |
|---|---|---|---|---|
| 0 Miles | 100 Miles | 300 Miles | 900 Miles | 1500 Miles |
| Castrol 12.20 | 12.00 | 11.99 | 12.18 | 12.39 |
| Pennzoil 11.16 | 10.96 | 10.93 | 10.92 | 11.09 |

Moreover, there was no material difference in percent viscosity loss between Castrol and Pennzoil. Based on the difference between the initial kinematic viscosity and the lowest kinematic viscosity reported for each oil in each vehicle during the course of the fleet test, Castrol 10W-30 experienced an overall permanent viscosity loss of 2.03% and Pennzoil 10W-30 experienced a slightly higher overall permanent viscosity loss of 2.96%.

### H. *Engine Failure/Engine Wear*

The secondary message promoted by Pennzoil's media campaign focuses on engine failure, premature engine wear, long-

er engine life and better engine protection. The critical areas of an engine that potentially could suffer adverse mechanical effects if viscosity breakdown occurs, are in the piston, valve train and main bearing areas of the engine.

### 1. Engine Failure

No tests have been conducted nor was any evidence presented that demonstrate that Pennzoil motor oils provide better protection against engine failure than Castrol motor oils.

### 2. Engine Wear

The issue of engine wear is legally complex and primarily theoretical since the type of engine wear that could result from viscosity breakdown would be unseen in an operating engine before 150,000 miles of operating use. Thus under normal operating conditions in the normal lifetime of a car consumers would not experience premature engine wear regardless of what major motor oil was used. Moreover, the industry has established a series of sequence engine tests to qualify motor oils which include tests for wear protection. Under the sequence test results, both Castrol and Pennzoil meet the highest performance requirements of the American Petroleum Institute (the "API")—the "SG" rating. According to the sequence tests and the API rating system, which is a pass/fail rating system, Pennzoil does not provide superior wear protection than Castrol.

In addition to the sequence tests there are additional tests that provide insight to engine wear. The purport of all of these tests is to show a greater film thickness in areas where metal to metal contact would lead to engine wear. The Bearing Oil Film Thickness test ("BOFT") is a laboratory test method for measuring minimum oil film thickness in the main crankshaft bearings of fired-passenger car engines. Bearing oil thickness relates to wear in an operating engine. Inadequate bearing oil film thickness may occasion metal to metal contact which leads to wear.

The L–38 test previously mentioned as a test of viscosity loss also measures various wear-related properties of motor oils including bearing weight loss, varnish deposits and sludge deposits. In order for a motor oil to qualify for the "SG" rating of API, it must have a bearing weight loss of no more than 40 mg. in the L–38 test. Castrol meets this requirement.

Finally, Elasto–Hydrodynamic tests ("ETD") were performed in the valve train area. The purpose of these tests is to demonstrate the film thickness in the EHD contact zones. In an operating engine Elasto Hydro Dynamic Force ("EHD") is found in the interface between the cam lobes and the cam followers. EHD is characterized by high pressures in the contact zone between these two metal parts.

### I. The Star Polymer and Viscosity Breakdown

Motor oil manufacturers strive to formulate motor oils which suffer no viscosity breakdown. The formula for the manufacture of motor oil contains base stock, polymers, detergents and anti-oxidants. Pennzoil uses a polymer known as the "Star" polymer. The purpose of the polymer, also known as a Viscosity Index Improver ("VI Improver"), is to resist viscosity breakdown. The difference between the star polymer and other conventional polymers is their molecular shape. When powerful forces inside an engine cause a VI improver molecule to break that breakage can create reactive chemical agents known as "free radicals." These reactive chemical agents bond with other chemical elements in the oil, such as anti-oxidants and undermine their effectiveness to combat engine wear due to oxidation and engine deposits. Pennzoil argues that its VI improver produces less free radicals than the VI improver used by Castrol and therefore provides greater protection against engine wear.

### J. Expert Testimony

Five expert witnesses presented testimony on viscosity breakdown and engine wear. Castrol's expert witnesses also provided testimony on industry standards. Pennzoil produced no expert testimony on industry standards.

### 1. Castrol Expert Testimony

Castrol produced Marvin F. Smith, Jr., Paul A. Bennett and William W. Grasseley.

Mr. Smith spent 28 years working at Exxon where he had first-hand experience formulating lubricants and running engine and fleet tests. (Smith Tr. at 8–13). He coined the phrase "OCP" for olefin co-polymer viscosity index improvers. He supervised extensive fleet testing of Exxon's 10W–40 oils and conducted industry sequence tests, including tests using the "L-38" Labeco test engine for engine oils. Mr. Smith was chairman of the American Society for Testing Materials ("ASTM") task force on shear stability, a member of the task force on shear test methods that developed the ASTM D–3945 test method, and was chairman of the ASTM high temperature rheology group.[2] He was also a member of the Society of Automotive Engineers ("SAE") Engine Oil Viscosity Classification Task Force, the SAE Committee responsible for classifying motor oils. Mr. Smith gave testimony as to industry standards, viscosity breakdown, the purpose of ASTM D–3945 and his opinion that the superiority claims contained in Pennzoil's media campaign are false.

Castrol's second expert, Mr. Bennett, spent 18 years at General Motors Research, where he conducted extensive engine testing on lubricants. He designed several of the industry "sequence tests" to qualify motor oils, including the Sequence III High Temperature Oil Oxidation Test. Mr. Bennett ran hundreds of automobile fleet tests and has vast experience analyzing fleet test and engine test results. He was one of the original members of the SAE group that established the SAE viscosity classification system. Bennett also testified as to industry standards, viscosity breakdown, the purpose of ASTM D–3945 and his opinion that the superiority claims asserted by Pennzoil in its media campaign are false.

William Grasseley is a professor at Princeton University within the Department of Chemical Engineering where he specializes in polymer science. Dr. Grasseley was a rebuttal witness and gave an opinion that the amount of free radicals and their effect on the anti-oxidant in Castrol motor oil was insignificant.

### 2. Pennzoil Expert Testimony

Pennzoil presented David Hoult and Hugh Spikes in support of their primary and secondary superiority claims. Neither of these witnesses presented testimony in regard to industry standards.

Dr. Hoult is a professor at MIT who works in the Department of Mechanical Engineering. He is currently engaged in lubrication research. He possesses expertise in the design and operation of pistons and piston rings. In addition to his work at MIT, Dr. Hoult serves on the Pennzoil Technical Advisory Board. Moreover, in recent litigation between Castrol and Quaker State he testified as an expert witness on behalf of Castrol. Dr. Hoult gave an opinion that Pennzoil's superiority claim "that Pennzoil outperforms the leading motor oils against viscosity breakdown" was true. He premised his opinion on the percent results of the ASTM D–3945 test. He also provided an opinion that Pennzoil would provide reduced wear rate at the top of the piston ring and in the valve train area.

Hugh Spikes is a senior lecturer in the Department of Mechanical Engineering at Imperial College, London, England. Dr. Spikes possesses expertise in thermofluids, lubrication and lubricant additives. Similar to Dr. Hoult he relied upon ASTM D–3945 and testified that Pennzoil motor oil shows less viscosity breakdown than other major oils and because of less viscosity breakdown Pennzoil is likely to result in better engine protection.

## V. DISCUSSION

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a civil remedy for the use of any false or misleading description of fact, or false or misleading repre-

---

**2.** Rheology is the description of the way that a fluid responds to stress. It concerns the flow of liquids. Viscosity and its study is a subset of Rheology. (Spikes Tr. at 1039).

sentation of fact, in connection with the sale of goods in interstate commerce. It states:

> Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which— ...
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods or services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Because Pennzoil and Castrol each manufacture and sell motor oils in interstate commerce and in direct competition with each other Castrol has standing to sue under the Lanham Act. 15 U.S.C. § 1125(a).

■ To prevail on a claim of false advertising under the Lanham Act, Castrol must demonstrate that defendant's claims are either literally false or are misleading to the consuming public. *Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.*, 902 F.2d 222 (3d Cir.1990). A claim that is unsupported which is not literally false or deceptive does not violate the Lanham Act. *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 253 (D.Del.1980). Moreover, the absence of acceptable tests or other proof does not alleviate a Lanham plaintiff's burden of showing that a challenged advertisement is false or misleading. *Sandoz*, 902 F.2d at 228.

■ If the claims of the advertisement are not literally false, plaintiff must demonstrate through a consumer survey that the advertising claim is in fact deceptive. *Id.* at 228–229. Because Castrol has not presented any consumer surveys of the kind discussed in *Sandoz*, the Court will not consider the degree to which consumers expect an advertising claim to be substantiated. Accordingly, Castrol must present affirmative evidence that Pennzoil's claims are literally false. Otherwise, it is not entitled to a permanent injunction.

## A. Aspects of the "Literally False" Standard

■ In order to determine whether a claim is literally false, courts examine whether (1) the claim complies with industry standards, (2) whether the claim makes any false statements by "necessary implication" and (3) whether any substantiation exists for the claims.

### 1. Industry Standards

■ In order to determine whether a claim is literally false courts have looked to objective industry standards rather than subjective standards of the party making the comparison. A Lanham plaintiff must prove the existence and parameters of such a standard in order to show the falsity of a superiority claim. *American Rockwool, Inc. v. Owens–Corning Fiberglas Corp.*, 640 F.Supp. 1411, 1443 (E.D.N.C.1986) (claim of more "quality control" and "supervisory time" in order to assure a "quality installation"). Claims that are untrue when usual and conventional meanings in an industry are applied have also been held to be literally false. In *Johnson & Johnson v. GAC International Inc.*, the use of the word "sapphire" in connection with the marketing of a poly crystalline orthodontic bracket was found to be facially false since the particles which made up the bracket were aluminum powder and it would be unconventional to refer to grains of aluminum oxide as sapphire. 862 F.2d 975, 981 (2d Cir.1988). Likewise, in *McNeil–P.C.C.; Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544 (2d Cir.1991), the manufacturer of Excedrin aspirin was enjoined from claiming that Excedrin "works better" than Tylenol. Although that case involved a comparison claim it teaches that representations found to be unsupported by accepted authority or research or which were contradicted by prevailing authority or research, may be deemed false on their face and actionable under § 43A(a) of the Lanham Act. *Id.* at 1546.

### 2. Statements Made by "Necessary Implication"

■ In assessing whether an advertisement is "literally false" a court must con-

sider the message in full context. An advertisement may be "facially false" based on the message it conveyed by "necessary implication," despite the fact that the false statement was not made "in haec verba." *Cusinarts, Inc. v. Robot–Coupe International Corp.*, No. 81 CIV 731 (S.D.N.Y. June 9, 1982) (LEXIS GenFed Library Dist. file). In *Tambrands, Inc. v. Warner Lambert Co.*, 673 F.Supp. 1190, 1193–94 (S.D.N.Y.1987), the court held advertisements to be "facially false" because they stated by "necessary implication" that a pregnancy test provided accurate results in ten minutes. *Accord Gillette Co. v. Wilkinson Sword, Inc.*, No. 89 CIV 3586, 1989 WL 82453, 1989 U.S. Dist. LEXIS (S.D.N.Y. July 6, 1989).

### 3. Unsubstantiated Claims

■ A claim that is advanced without any substantiation may be found to be facially false because the advertiser has absolutely no grounds for believing that the claim is true. *Sandoz*, 902 F.2d at 228 n. 7. Although the *Sandoz* court did not reach this issue unsubstantiated claims were held to be facially false in *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 983 (D.N.J.1979) and *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 111 (D.N.J.1987).

### B. *Pennzoil's Viscosity Breakdown Claim Is Literally False*

#### 1. Industry Standards

■ Marvin Smith and Paul Bennett, both credible witnesses, provided testimony as to industry standards. Each of them confirmed that the only meaningful and accepted requirements to measure an oil's viscosity after it has been subjected to the stress of shearing and high temperatures are the "stay-in-grade" and the "high temperature/high shear" requirements.

The "stay-in-grade" requirement is a pass/fail standard and both Castrol and Pennzoil each stay-in-grade. As previously stated, industry standards or specifications do not rank motor oils higher than others on the basis of a higher after shear kinematic viscosity. All tests conducted by the parties or by independent testing facilities confirm this fact. CCMC, ILSAC, DOD and Chrysler all have adopted this standard. Thus, according to this industry requirement, Pennzoil's superiority claim is literally false.

The HTHS requirement simulates the environment in an operating engine. The motor oil is exposed to high temperature and high shear conditions. The HTHS standard requires that all motor oils retain a certain level of viscosity measured in units of centipoise. In order to meet this viscosity breakdown standard, all 5W–30, 10W–30 and 10W–40 motor oils must measure a number of units of centipoise. CCMC requires at least 3.5 cP, ILSAC requires 2.9 cP, as does Chrysler and Ford. GM requires 2.7 cP. Independent tests prove that Pennzoil does not outperform Castrol against viscosity breakdown according to any HTHS specification in the motor oil or automotive industry. In fact, Pennzoil's 5W–30 and 10W–30 motor oils both failed to meet the CCMC 3.5 cP standard, although they passed the other HTHS standards. In contrast, Castrol passed all HTHS standards, including the CCMC. Accordingly, since Pennzoil does not outperform Castrol on the HTHS industry requirement, its superiority claim is literally false.

■ Pennzoil relies on ASTM D–3945 in support of its contention that Pennzoil motor oil "outperforms any leading motor oil against viscosity breakdown." Pennzoil's reliance on ASTM D–3945 is misplaced for several reasons. ASTM D–3945 was adopted in 1980 as a quality control tool for manufacturing purposes, not as an industry standard of viscosity breakdown. (Smith Tr. at 100; Bennett Tr. at 356). ASTM, unlike the CCMC or ILSAC, does not set industry standards for motor oils. ASTM is a society that prepares industry-recognized laboratory tests to provide data to motor oil and automotive manufacturers. While it sets standards for its test procedures, it does not set motor oil viscosity performance standards for the motor oil industry.

ASTM D-3945 measures the percent viscosity loss at 100°C of polymer containing fluids. The viscosity loss reflects polymer degradation due to shear at the nozzle. The resultant degradation reduces the kinematic viscosity of the fluid under test. The reduction in kinematic viscosity reported as percent loss of the initial kinematic viscosity is a measure of the shear stability of the polymer containing fluid.

Pennzoil ignores the caveat embodied in the test standard as to the significance and use of ASTM D-3945. In § 4.2 it states "these test methods [procedure A and procedure B] are not intended to predict viscosity loss in field service for different polymer classes or for different field equipment." Moreover, Smith testified that ASTM D-3945 would be an inappropriate method to use in comparing the post-shear kinematic viscosity levels of two oils in an operating engine because the shear stress on the oil at the nozzle is more than produced in an operating engine and produces lower levels of viscosity than would be seen in the field. (Tr. at 104).

There is no standard or specification in the motor oil or automotive industries that grades or ranks motor oils based on percent permanent viscosity loss, as measured by ASTM D-3945 or any other method. (Smith Tr. at 261; Newsom Tr. at 721; Tittel Tr. at 372–73). Neither Pennzoil nor any other individual, company or organization has ever proposed such a standard or specification, and neither the SAE or ASTM has ever considered such a standard or specification. (Smith Tr. at 67; Bennett Tr. at 347–48).

Other than the "Stay-in-Grade" standard, there is no standard or specification in the motor oil or automotive industries that grades or ranks motor oils based on the level of after shear kinematic viscosity, as measured by ASTM D-3945 or any other method. (Smith Tr. at 261; Bennett Tr. at 349–50). Moreover, Pennzoil itself does not have a percent viscosity loss or permanent viscosity loss specification. Consistent with recognized industry standards of viscosity breakdown, Pennzoil's own "In-ternal Viscometric Specifications" contain a "Stay-in-Grade" requirement.

By industry standards the empirical data made available to the Court and the evidence provided through expert testimony renders Pennzoil's viscosity breakdown superiority claim literally false.

### 2. Necessary Implication and Unsubstantiated Claims

Given that the Court has determined that by industry standards Pennzoil's superiority claim is literally false, it need not discuss whether Pennzoil's advertisement is facially false by "necessary implication" or through "unsubstantiated" claims. Under these aspects of literal falsity, the superiority claim would be equally false.

### C. *Engine Failure, Premature Engine Wear, Longer Engine Life and Better Engine Protection*

▬ No testimony was produced as to engine failure. Equally true is the marked absence of any scientific exhibit or data that would permit the Court to infer the existence of engine failure by use of a motor oil other than Pennzoil. Indeed, Pennzoil's Vice President of Product Support, Donald M. Johnson, in his deposition admitted that he did not believe that with either Pennzoil or Castrol customers would experience premature engine failure. (Johnson Dep. at 214). Mr. Johnson could not document a single instance of engine failure attributed to viscosity breakdown. (Johnson Dep. at 219). He did not think it was true that someone who used Castrol would have an enhanced risk of engine failure as compared with someone who used Pennzoil. (Johnson Dep. at 335). This claim is literally false, false by "necessary implication" and unsubstantiated.

▬ Pennzoil contends its secondary superiority claims are not comparative claims and do not imply shorter engine life or greater engine wear will occur if a leading motor oil other than Pennzoil is used. Furthermore, in the opinion of Pennzoil's marketing expert, Virginia Miles, the consumer will not perceive any proportionality be-

tween the amount of viscosity breakdown and the amount of engine wear.

Although Castrol did not produce testimony of a consumer perception expert and its efforts to gauge consumer perception were minimal, the Court must consider the message in full context to determine if it is literally false. *Cuisinarts,* 81 Civ. at 4–5; *accord, Tambrands,* 673 F.Supp. at 1194. As the Court reads the advertisement in its full context, the necessary implication is that the secondary superiority claims are dependent on the primary superiority claim of less viscosity breakdown. Because they are dependent and interrelated to viscosity breakdown, they are necessarily false if the viscosity breakdown claim is likewise false. Conversely, even if the viscosity breakdown superiority claim were true, it would not necessarily follow that the secondary superiority claims would similarly be true.

Aside from the literal falsity of the viscosity breakdown claim, the secondary claims are unsubstantiated, and perforce literally false. Both Dr. Hoult and Dr. Spikes premised their testimony primarily on the reliability and acceptance of the ASTM D–3945 results. If these results fail to demonstrate that Pennzoil "outperforms any leading motor oil against viscosity breakdown" then their opinions as to engine wear and protection are unsupported and subject to little weight.

Pennzoil misapprehends the importance of percent viscosity loss and permanent viscosity loss. Percent permanent viscosity loss and the amount of permanent viscosity loss measured by ASTM D–3945 are irrelevant to engine protection. (Smith Tr. at 43, 67; Bennett Tr. at 348–49). The level of viscosity the engine actually experiences in operation, not the amount of the loss in the ASTM D–3945 procedure, is what is significant to engine performance. (Smith Tr. at 67). The amount of viscosity loss itself is of no significance to the operation or protection of the engine.

In addition, ASTM D–3945 measures permanent viscosity loss and after-shear viscosity levels in terms of kinematic or low shear viscosity. (Bennett Tr. at 348). As evidenced by the motor oil and automotive industries' focus on HTHS viscosity for more than a decade, the industry consensus is that kinematic viscosity measured at 100°C does not relate to engine wear and protection. The parts of the engine most susceptible to wear operate in high temperature, high shear conditions. (Smith Tr. at 43, 63).

█ A commercial which suggests to consumers, either expressly or implicitly, that there is scientific evidence to establish the truth of a product superiority claim, but which is not in fact substantiated by such evidence, is literally false under the Lanham Act. *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2d Cir.1991) (holding that "representations found to be unsupported by accepted authority or research or which are contradicted by prevailing authority or research may be deemed false on their face"); *Stifel Co. v. Westwood Lighting Group,* 658 F.Supp. at 1111; *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1223 (D.Del.1986); *Johnson & Johnson v. Quality Pure Manufacturing, Inc.,* 484 F.Supp. 975, 983 (D.N.J.1979).

█ Pennzoil's claims that its motor oils prevent "engine wear," and provide "longer engine life," more effectively than do other leading motor oils necessarily suggest to consumers that they are substantiated by scientific evidence. However, Pennzoil did not perform any comparative engine wear tests to support these claims, before or after these advertisements were disseminated. The Pennzoil advertisements are completely unsubstantiated. In addition, the expert testimony and engine wear test results presented by Castrol demonstrated that Pennzoil does not provide superior wear protection. These claims are therefore literally false.

Pennzoil's own witnesses testified that there is no difference between Castrol and Pennzoil in terms of engine protection during the normal lifetime of a car. Pennzoil's Director of Motor Oil Research, James Newsom, admitted that under normal operating conditions in the normal lifetime of a car, consumers would not have problems with premature engine wear if they used

any of the major motor oils. (Newsom Tr. at 753). In response to the Court's inquiry Pennzoil's expert witness, Dr. David Hoult, admitted that differences in wear patterns between different motor oils will only be indicated if the engine lasts 150,000 miles, and even then the effects will not be big. (Hoult Tr. 823). Dr. Hoult further testified that, on average in the United States, cars go to the "junkpile" at about 120,000 miles. *Id.*

Dr. Hoult and Dr. Spikes testified on behalf of Pennzoil. Their testimony related to the potential for wear in the piston, valvetrain and main bearing areas of the engine. Although their credentials were impressive, the substance of their testimony was speculative and unconvincing. They had been retained after institution of the complaint and relied on data that was either insignificant or gathered in an unscientific manner. The EHD tests (2) are a perfect case-in-point. The first set of tests had "gross inconsistencies" and the second set of tests were run at a less than optimum ambient temperature. Furthermore, the EHD test is limited to the area of the valve train (cam lobe/cam follower interface) and does not measure engine protection.

Other than theory, no definitive evidence of wear in any of the critical engine areas was provided to the Court. Nor is it likely that wear data based on a comparison of motor oils could be produced without significant and appropriately designed wear tests. Lastly, the premise that Pennzoil's "star" polymer VI improver produces less free radicals than the VI Improver used by Castrol was refuted by Dr. Grasseley. Indeed, Pennzoil never compared its free radical output to the free radical output of Castrol. Accordingly, any claim to superior engine protection and less engine wear due to the presence of free radicals is unsubstantiated and literally false.

## VI.  PERMANENT INJUNCTIVE RELIEF

■ Because Castrol and Pennzoil compete in the same market and target similar consumers, the competition for market share is intense. Although no proof of sales diversion has been adduced before this Court, repeated effective suggestions of competitive superiority could eventually result in a loss of sales that otherwise would not have occurred. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190–91 (2d Cir.1980); *see also McNeil–P.C.C.*, 938 F.2d at 1549 (irreparable harm may be presumed where an advertisement falsely proclaims the superiority of defendant's product). It is clear that, absent injunctive relief, Pennzoil's false superiority claims possess the potential to irreparably harm Castrol.

In addition to the irreparable harm that may result to Castrol, this Court is cognizant of the compelling public interest to protect competitors and consumers from false commercial advertising claims. To countenance a Lanham Act violation without some restraint would not only subvert the will of Congress as expressed in the Lanham Act, but would also send a wrong message to the business community. The slippage in competitive fairness must be resisted at every level of concern. Whenever competitive unfairness exists, whether it be of an antitrust nature, a disrespect for intellectual property, or a false advertising claim, swift and certain penalties must attach to the offending conduct.

The balancing of the equities in this action clearly favors permanent injunctive relief. Pennzoil can assert no equitable interest in the perpetuation of an advertising campaign that is literally false. Moreover, Pennzoil is a large and sophisticated company with a comprehensive marketing program. Since its advertising campaign was in its development stages in 1991, Pennzoil has anticipated the possibility that its advertising would be challenged and planned a "fallback position" to replace the current ad campaign. Pennzoil has access to advertising from previous campaigns which could be substituted for the advertising challenged in this case. Indeed, at the hearing on Castrol's application for a temporary restraining order on April 8, 1992, the Court put Pennzoil on notice that it would not later entertain arguments about

alleged burdens that an injunction would impose upon Pennzoil.

Based on the foregoing findings of fact and conclusions of law, Pennzoil, its agents, servants, officers, employees, and all those acting under its control or on its behalf, will be permanently enjoined from:

(a) broadcasting, publishing or disseminating, in any form or in any medium, the commercials or claims contained in the commercials, the storyboards for which are attached as Exhibits A through E to the Affidavit of Richard G. Tittel ("Tittel Aff.") in Support of a Temporary Restraining Order and Preliminary Injunction;

(b) broadcasting, publishing or disseminating, in any form or in any medium, any revised or reformulated false or deceptive version of the commercials, the storyboards for which are attached as Exhibits A through E of the Tittel Aff.;

(c) broadcasting, publishing or disseminating, in any form or medium, any commercial or advertisement that claims, directly or by clear implication, that:

(i) Pennzoil motor oil outperforms any leading motor oil against viscosity breakdown;

(ii) Pennzoil motor oil gives the most protection against viscosity breakdown of any leading motor oil;

(iii) Pennzoil motor oil provides better protection against engine failure than any leading motor oil;

(iv) Pennzoil motor oil provides better protection against engine wear than any leading motor oil; or

(v) Pennzoil motor oil provides longer engine life or greater engine durability than any other leading motor oil.

This permanent injunction shall take effect on or before May 29, 1992. The Court shall retain jurisdiction for the purpose of enforcing or modifying this permanent injunction.

## VII. SUPPLEMENTAL CLAIMS

Subsequent to trial, Castrol voluntarily withdrew its claim to relief under the New Jersey Consumer Fraud Act. Because of the Court's Lanham Act determination, it is not necessary to consider Castrol's common law unfair competition claim and the Court declines to do so. It will be dismissed without prejudice.

## VIII. ATTORNEYS' FEES

■ Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." A court has discretion to award attorneys' fees to the prevailing party in a Lanham Act case involving willful or bad faith conduct. *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44 (3d Cir.1991); *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 971 (D.C.Cir.1990). The Senate Report of the Lanham Act stated that attorneys' fees should be awarded where the infringing acts "can be characterized· as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Ferrero* at 47.

■ This Circuit requires that before a case qualifies as "exceptional," a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement. *Id.* at 47. The facts of this case do not lead to the inference that Pennzoil acted in a deliberate or willful manner.

Pennzoil did not engage in bad faith advertising merely because the Court found its claim to be meaningless by industry standards. Moreover, they produced expert testimony in support of their superiority claims as to engine wear and engine protection. Although the Court found this testimony unconvincing and rejected it, nonetheless it was a worthy effort which dispels any judicial consideration of bad faith, malice, fraud, or willfulness.

Accordingly, the Court finds that this case is not an exceptional case and will not award Castrol its attorneys' fees.

## IX. CONCLUSION

For the reasons expressed above, this Court finds that Pennzoil's advertising claims currently broadcast, published or disseminated, are literally false and in vio-

lation of § 43(a) of the Lanham Act. They shall be permanently enjoined commencing on or before May 29, 1992. Castrol's pendent jurisdiction claims will be dismissed without prejudice, and Castrol's claim for compensatory and punitive damages, and award of attorneys' fees will be denied.