

2001 Decisions

12-21-2001

# Highmark Inc v. UMPC Health Plan

Precedential or Non-Precedential:

Docket 01-1377

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Highmark Inc v. UMPC Health Plan" (2001). *2001 Decisions.* Paper 296.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/296

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1377

HIGHMARK, INCORPORATED,

v.

UPMC HEALTH PLAN, INCORPORATED,
        Appellant

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. No.: 01-cv-00254
District Judge: Honorable William L. Standish

Argued: October 17, 2001

Before: ALITO, BARRY, and ROSENN, Circuit Judges

(Filed: December 21, 2001)

        Christine L. Donohue (Argued)
        Bryan S. Neft
        David W. Snyder
        Klett, Rooney, Lieber &
         Schorling
        A Professional Corporation
        One Oxford Centre, 40th Floor
        Pittsburgh, PA 15219
         Counsel for Appellant

          Michael E. Lowenstein (Argued)
          Daniel I. Booker
          Gary L. Kaplan
          Gregory M. Luyt
          Reed Smith LLP
          435 Sixth Avenue
          Pittsburgh, PA 15219
           Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal has its genesis in the intense commercial rivalry between two insurers licensed in Pennsylvania to underwrite health insurance plans. This rivalry erupted in advertisements that appeared in the Pittsburgh Post-Gazette in February 2001. We had occasion almost a decade ago to observe the "dynamic role" commercial advertising plays in the financial and industrial activities of our society. Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 940-41 (3d Cir. 1993). Whether the McCarran-Ferguson Act (the McCarran Act), 15 U.S.C. SS 1011-1015, bars a false advertising claim by an insurer against another insurer under Section 43(a) of the Lanham Act, 15 U.S.C. S 1125(a)(1)(B), is an issue of first impression in this court.

Alleging that UPMC Health Plan, Inc. (UPMC), one of the foregoing insurers, published full-page advertisements (the UPMC ad or the Ad) in the Pittsburgh Post-Gazette in February 2001 containing deceptive misstatements in comparing insurance plans offered by UPMC and Highmark, Inc. (Highmark), the other insurer, Highmark, promptly sought injunctive relief and damages in the United States District Court for the Western District of Pennsylvania. The bases for its action are that the UPMC ad contained false statements and deceptive advertising in violation of Section 43(a) of the Lanham Act, state common law claims of commercial disparagement, and intentional interference with contractual relations.

UPMC moved to dismiss the action for lack of subject matter jurisdiction, contending that neither its Ad, nor the

2

services mentioned therein, substantially affect interstate commerce as required under Section 43(a) of the Lanham Act. UPMC later asserted that plaintiff 's Lanham Act claims also were proscribed by the McCarran Act and the Pennsylvania Unfair Insurance Practices Act (UIPA), 40 PA. CONS. STAT. ANN. SS 1171.1–.15 (1999). After a two-day hearing, the District Court denied the motion to dismiss and granted Highmark's motion for a preliminary injunction. In granting the injunction, the District Court found that UPMC's ad contained nine separate literally false statements. The Court also found that UPMC's advertising had a tendency to deceive the intended readers. The Court's order required UPMC to cease and desist further dissemination of its Ad and any other false and deceptive advertisements or marketing materials containing a claim specifically found by the District Court to be false and misleading. UPMC timely appealed to this Court. We affirm.

I.

As a licensed insurer, UPMC offers two health insurance plans marketed solely to employers and subscribers in Western Pennsylvania, the Enhanced Access Point of Service plan and the Enhanced Access HMO plan. Highmark, also a licensed insurer, offers three health insurance plans under its CommunityBlue umbrella, including its CommunityBlue Direct plan. The CommunityBlue Direct plan is also marketed solely to employers and subscribers in Western Pennsylvania. Both UPMC plans and Highmark's CommunityBlue Direct plan are network-based plans. As such, they utilize the services of hospitals and physicians under contract with the plan to provide health care to subscribers. UPMC's plans and Highmark's plan make their services available outside of their respective networks, but at a greater cost to the subscriber, through deductibles and co-payments.

The County of Allegheny chose the UPMC health plans and the Highmark CommunityBlue Direct plan as the exclusive health insurance plans offered to the County's non-union employees during the open enrollment period beginning on February 1, 2001. On February 1 and February 4, 2001, UPMC published full-page

advertisements in the Pittsburgh Post-Gazette comparing various features of UPMC's and Highmark's plans. The top of the Ad states "A message to the employers of Allegheny County," and asks "If you were diagnosed with a serious illness tomorrow, which health plan would you rather have?" The District Court found nine statements in the Ad (including seven statements comparing UPMC and Highmark health care plans) were false and misleading.

The District Court reviewed the prerequisites for a preliminary injunction. Based on its findings of fact, it concluded that Highmark had established that it was likely to succeed on the merits and that it would suffer irreparable injury if injunctive relief were denied. The Court also balanced the hardship to the parties and considered the public interest. On balance, it reasoned that the injunction would prevent UPMC "from gaining an unfair advantage in its competition with Highmark" and that the public interest would best be served by a cessation of the Ad and the publication of a corrective advertisement. It thereupon granted the application for the injunction.

II.

On appeal, UPMC raises two significant legal issues. First, it claims the Ad does not substantially affect interstate commerce, and thus there is no Lanham Act jurisdiction. It also claims that the McCarran Act bars the application of the Lanham Act, because to do so would invalidate, impair, or supersede Pennsylvania's Unfair Insurance Practices Act.

First, we address the jurisdictional issues with respect to Highmark's Lanham Act claim. This is essentially a legal issue and our standard of review is plenary. United States Sec. & Exch. Comm'n v. Infinity Group Co., 212 F.3d 180, 186 n.6 (3d Cir. 2000).

UPMC argues that the Lanham Act's interstate commerce requirement is not met because it directed its Ad to employees of Allegheny County, Pennsylvania, and the advertised health plans are sold only in Pennsylvania. Thus, it maintains that there is no substantial effect on interstate commerce. The District Court rejected this

4

argument, holding that the Ad does indeed substantially affect interstate commerce.

A.

The Lanham Act provides civil liability for any person who "uses in commerce" any false or misleading description or representation of fact which in commercial advertising misrepresents the nature, characteristics, or qualities of any person's services or commercial activities. 15 U.S.C. S 1125(a)(1)(B). The term "commerce," as used in the Act, refers to "all commerce which may lawfully be regulated by Congress." 15 U.S.C. S 1127. It has long been acknowledged that the Act "confers broad jurisdictional powers upon the courts of the United States." Steele v. Bulova Watch Co., 344 U.S. 280, 283 (1952); accord U.S. Healthcare, Inc. v. Blue Cross, 898 F.2d 914, 922 (3d Cir. 1990) ("The commerce requirement has been broadly interpreted."). Congress's authority under the interstate commerce clause extends even to purely intrastate activity if that activity substantially affects interstate commerce. United States v. Lopez, 514 U.S. 549, 558-59 (1995).

The District Court held that five nexi substantially affect interstate commerce. First, the Pittsburgh Post-Gazette is distributed interstate and, therefore, the Ad appeared outside Pennsylvania. Second, the health plans referred to in the advertisements offer emergency care to patients outside of Pennsylvania. Third, the Highmark plan applies to subscribers residing outside of Pennsylvania, and services may be provided to a subscriber's dependents who reside outside of Pennsylvania. Fourth, subscribers may be referred to a hospital or medical facility outside of Pennsylvania. Finally, the Ad might have an impact on the parties outside of Pennsylvania. UPMC does not challenge the Court's factual findings, appealing only the Court's holding that these facts are sufficient to give the Court Lanham Act jurisdiction.

The District Court's findings relating to the health plan services offered outside of Pennsylvania support its conclusion with respect to interstate commerce. Cynthia Dellecker, Highmark's vice president of product

5

management and development, testified that CommunityBlue Direct covers subscribers' dependents residing outside of Pennsylvania, and that CommunityBlue Direct offers emergency care outside of the state and country. She also testified that CommunityBlue Direct subscribers have access to out-of-state hospitals such as Sloan-Kettering, the Cleveland Clinic, Massachusetts General Hospitals, and the Mayo Clinic. Dr. Kenneth Melani, the executive vice president of Highmark for strategic business development and health services, testified that Highmark has approved care for subscribers at Sloan-Kettering. Melani further noted that Joslin Clinic, a CommunityBlue Direct network hospital situated in Boston, Massachusetts, is an internationally recognized diabetes treatment center.

John DeGruttola, the chief marketing officer for UPMC, acknowledged that Highmark has arrangements with the Cleveland Clinic and Johns Hopkins University, situated in Baltimore, Maryland. Moreover, UPMC covers medical emergency care outside Pennsylvania, and, according to DeGruttola, he's "never had a complaint come across . . . that said th[e UPMC] card wasn't recognized across the United States or in the world." The record testimony amply supports the District Court's conclusion with respect to the substantial effect on interstate commerce.

B.

We turn now to UPMC's contention that the McCarran Act and Pennsylvania's UIPA bar application of the Lanham Act. Because it is an issue of law, we exercise plenary review over the District Court's holding that the McCarran Act does not proscribe Highmark's Lanham Act claims. United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817, 822 (3d Cir. 2000). The McCarran Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . ." 15 U.S.C. S 1012(b). To determine whether the McCarran Act applies, this Court considers the threshold question to be whether the activity complained of constitutes the "business of insurance." Sabo v. Metropolitan Life Ins. Co.,

6

137 F.3d 185, 191 (3d Cir. 1998). If the activity does not constitute the "business of insurance," then the McCarran Act does not apply. Id. at 190. If, on the other hand, the activity does constitute the "business of insurance," we then look to whether S 1012(b) precludes a federal cause of action. Id. at 189. Federal jurisdiction is barred if three requirements are met: (1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law. Id.

As for the threshold question, the action complained of -- the advertising -- constitutes part of the business of insurance. The District Court, without discussion, concluded that the advertising practices of the parties involved the business of insurance. Although we are not referred to any appellate case squarely on point, we perceive no error in this conclusion. The Ad dealt with the scope and services offered by the insurers to their subscribers and thus concerned the "business of insurance." See, e.g., Fed. Trade Comm'n v. Nat'l Cas. Co., 357 U.S. 560, 562-63 (1958); accord Sec. & Exch. Comm'n v. Nat'l Sec., Inc., 393 U.S. 453, 460, (1969) (advertising is the business of insurance).[1]

_____

1. Twenty-five years after National Casualty the Supreme Court of the United States laid out a three-pronged test for determining what is the "business of insurance" for purposes of deciding whether the McCarran Act precludes application of federal antitrust law. Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119 (1982). These prongs are first, whether the practice transfers or spreads a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. Id. at 129. Although it could be argued that Pireno impliedly overruled National Casualty, United States Department of Treasury v. Fabe, 508 U.S. 491 (1993), casts doubt upon that interpretation. In Fabe the Court noted that Pireno dealt with the McCarran Act's effect on antitrust laws, which the Court found readily distinguishable from other laws. Id. at 504. This is because there are two separate clauses in the McCarran Act. According to the Supreme Court, the second clause, which proscribes application of antitrust laws, is

7

Concluding that advertising constitutes the business of insurance, we must look to whether the three statutory requirements bar federal jurisdiction. We need not tarry long on the first two requirements. The Lanham Act under which this suit is brought does not specifically or otherwise relate to the business of insurance. As for the second requirement, Pennsylvania enacted the Unfair Insurance Practices Act (the UIPA) in 1974 and expressly stated its policy as follows:

> The purpose of this act is to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in the [McCarran-Ferguson Act], by defining or providing for the determination of all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

40 PA. CONS. STAT. ANN. S 1171.2 (1999)(footnote omitted). Judge Standish for the District Court recognized that Pennsylvania enacted the UIPA to regulate the business of insurance. Its plain language having done so, we agree.

The more difficult question is in the third requirement -- does application of the Lanham Act invalidate, impair, or supersede the state regulation of deceptive and false

_____

more "narrowly circumscribed" than the first clause, which deals with federal laws in general. Id. Only the first clause is pertinent in this case.

The general clause (the first clause) provides:"[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ." The Supreme Court sees a distinction between the"business of insurance" and laws that serve the purpose  of regulating the business of insurance. This distinction makes it difficult, if not impossible, to apply
Pireno to insurance advertising under the Lanham Act, because the Lanham Act is a general law controlled by the first clause. In a case on point, a South Carolina District Court concluded that National Casualty remains good law, and held that laws regulating insurance advertising are laws whose purpose is to regulate the business of insurance. Colonial Life & Accident Ins. Co. v. American Family Life Assurance Co., 846 F. Supp. 454, 460 (D.S.C. 1994).

practices in violation of the McCarran Act? The District Court concluded that it does not and we again agree.

A federal law impairs a state law if: (1) it directly conflicts with the state law; (2) applying federal law would frustrate any declared state policy; or (3) applying federal law would interfere with a state's administrative regime. Humana Inc. v. Forsyth, 525 U.S. 299, 310 (1999). A federal law supersedes a state law if it "displace[s] (and thus render[s] ineffective) [state law] while providing for a substitute rule." Id. at 307. UPMC argues that the policy of the UIPA is exclusive and that only the Pennsylvania Legislature can define or provide for the determination of all unfair insurance practices, "not Congress or the federal courts." UPMC claims that applying the Lanham Act here would impair or supersede Pennsylvania law.

The District Court noted that the UIPA is enforceable only by the State Commissioner of Insurance and confers no private right of action. However, it also observed that state law actions for deceit and fraud in connection with the insurance industry are not barred, and are available to provide remedies for victims of illegal insurance practices. Pennsylvania's allowance of private actions like these to proceed casts doubt upon the UIPA's exclusivity.

Pekular v. Eich, a decision of a Pennsylvania appellate court, supports the District Court's finding. The court in Pekular allowed plaintiff 's common law claims of fraud and deceit to proceed, along with a claim under the Pennsylvania Unfair Trade Practices Consumer Protection Law (CPL), despite the UIPA. 513 A.2d 427 (Pa. Super. Ct. 1986). By allowing the common law and the CPL to define unfair trade practices, the court tacitly acknowledged that the UIPA is not exclusive. "[T]he UIPA contains no provision either stating or implying that the power vested in the Insurance Commissioner represents the exclusive means by which an insurer's unfair or deceptive acts are to be penalized . . . ." Id. at 434. It is also worth noting that since the decision in Pekular fifteen years ago, the state legislature has had more than enough time to address whatever exclusivity might exist in this policy. Its failure to do so is further evidence that there is no such exclusive policy.

9

Moreover, this Court has also recognized the lack of UIPA exclusivity. In ruling that a federal court could consider a private RICO claim despite the UIPA, the Court noted that it found no indication, through legislative intent or judicial interpretation, "that Pennsylvania's non-recognition of a private remedy under the UIPA represents a reasoned state policy of exclusive administrative enforcement or that the vindication of UIPA norms should be limited or rare." Sabo, 137 F.3d at 195. Although vindication of UIPA norms came through RICO in Sabo, those norms were inherently defined by RICO, not the UIPA. Remarkably, UPMC tries to gainsay the obvious, by arguing that "[a]lthough a RICO claim may provide a remedy for conduct that falls under the rubric of the UIPA, a court adjudicating a RICO claim will not necessarily `determine' whether such conduct constitutes an `unfair method of competition' or an `unfair or deceptive act or practice' in the insurance industry." To state that proposition illustrates its invalidity. By its very nature, a company that violates the RICO statute has participated in an unfair method of competition. UPMC's assertion is akin to a claim that a conviction of murder is not necessarily a finding that such a person is guilty of a violent crime. Allowing Highmark's private action to proceed under the Lanham Act is merely a logical extension of Sabo , and not the huge leap UPMC would make of it.

After examining the federal legislation and Pennsylvania's UIPA, the District Court found that the Lanham Act neither conflicts with UIPA nor invalidates, impairs, or supersedes its provisions. The District Court therefore concluded that the McCarran Act does not bar the application of the Lanham Act provisions to such practices. Not only does the Lanham Act not invalidate, impair, or supersede the UIPA, or interfere with the State Commissioner's enforcement of its provisions, it also supports the State's efforts to correct such practices by allowing private actions in the federal courts.

UPMC contends that the Lanham Act supersedes Pennsylvania law by providing different standards of liability than the UIPA, and therefore Highmark's Lanham Act claim interferes with Pennsylvania's administrative regime in violation of the McCarran Act. As UPMC observes,

the standard to obtain a permanent injunction under the Lanham Act is less formidable than under the UIPA. UPMC claims the UIPA is thus rendered literally ineffective (i.e., superseded) by the Lanham Act because plaintiffs, given a choice, will elect to file claims with an easier burden of proof. This argument, however, also ignores precedent.

If different standards of liability were enough to render the UIPA ineffective under the McCarran Act, then this Court would not have allowed RICO claims to proceed in Sabo. As this Court noted in Sabo, the UIPA provides for actions solely through the Pennsylvania Insurance Commissioner, and not privately. 137 F.3d at 192. Thus, vindication of UIPA norms would seemingly be rare. Allowing private actions when none is provided by state law permits the insurance commissioner to proceed and also provides a victim of deception a private cause of action. Obviously, all things being equal, victims would much rather file a private cause of action than rely on an administrative process. In Sabo, we allowed the RICO claimant to proceed despite the UIPA. Pennsylvania state courts also have allowed private actions under state common and statutory law. See, e.g., Pekular v. Eich, 513 A.2d 427 (Pa. Super. Ct. 1986). In light of these precedents, the District Court did not err in holding that the UIPA is not superseded by the Lanham Act.

UPMC also argues that the more liberal remedies provided by the Lanham Act impair Pennsylvania's administrative scheme, and should bar Highmark's Lanham Act claim. In Sabo, this Court stated that it would "leave for another day the question of whether different federal and state remedies could ever be the basis for preclusion under the Act." 137 F.3d at 195. More liberal remedies are found under RICO than the UIPA. See id. at 192-93 (RICO's remedies authorize awarding treble damages, attorney's fees, and costs). This did not prevent the Court from allowing the RICO claim to proceed, as it noted that Pennsylvania's general consumer protection statute (available as a cause of action), like RICO, allows for treble damages. Id. at 195. The Sabo Court did not limit itself to a RICO-UIPA comparison, and we will not limit ourselves to a Lanham Act-UIPA comparison.

11

Although the Lanham Act provides stronger remedies than the UIPA, compare 15 U.S.C. S 1117(a) (allowing recovery of defendant's profits, unlimited damages, and court costs) with 40 PA. CONS. STAT. ANN.SS 1171.9, 1171.11 (1999) (allowing orders enjoining the unlawful activity, suspension or revocation of the defendant's license, and capping monetary awards), the point of reference should also include Pennsylvania common law remedies, as the Court included in Sabo. Highmark's common law claims include tortious interference with potential contractual relations, and assuming it could bring such an action, the Lanham Act's remedies do not appear unduly severe. Moreover, Pennsylvania allows for punitive damages for a tortious interference with a prospective business relationship claim. See SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702 (Pa. 1991). Punitive damages can easily meet, if not exceed, Lanham Act damages. The UIPA itself, in light of its non-exclusive nature, does not provide a basis for the Court to determine if different federal and state remedies can be a basis for preclusion under the McCarran Act.

Finally, UPMC argues that common law claims are not available to insurers like Highmark under Pennsylvania law, and allowing Highmark's Lanham Act claim to proceed impairs Pennsylvania's administrative scheme. As UPMC correctly notes, Pennsylvania courts have not yet squarely decided whether insurers can bring private false advertising claims. Again, however, precedent indicates that such claims would be allowed. As the Pekular court stated, when finding common law remedies and the UIPA to coexist, "we do not read [precedent] to preclude existing common law remedies such as fraud and deceit." 513 A.2d at 431. UPMC argues that this statement refers only to fraud and deceit actions. The Court's language, however, is not so narrowly drawn. It speaks of "existing common law remedies" and illustrates them with fraud and deceit. There is no reason to believe that Highmark's common law claims, already in existence at the time of the UIPA enactment, would be barred by Pennsylvania's courts. See Metro. Prop. & Liab. Ins. Co. v. Ins. Comm'r, 580 A.2d 300, 303 (Pa. 1990)(finding that provisions of the UIPA are not all encompassing and that common law remedy of rescission is

12

not precluded by UIPA); Baker v. Pa. Nat'l Mut. Cas. Ins. Co., 559 A.2d 914, 915–16 n.1 (Pa. 1989)(noting that the UIPA does not provide the exclusive remedy in cases involving improper conduct on the part of insurance companies); Commonwealth v. Allstate Ins. Co. , 729 A.2d 135, 139–40 (Pa. Commw. Ct. 1999)(finding UIPA is not the exclusive remedy for fraudulent insurance practices). Accordingly, the District Court committed no error in rejecting UPMC's arguments that this action is barred by the McCarran Act.2

III.

Notwithstanding subject matter jurisdiction in the federal District Court,3 UPMC contends that the District Court erred in granting the preliminary injunction. We use a three-part standard to review the District Court's decision. The ultimate decision to grant the preliminary injunction is reviewed for abuse of discretion; the District Court's findings of fact are reviewed for clear error; and the District Court's conclusions of law receive plenary review. Warner–Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 89 n.1 (3d Cir. 2000).

A.

Four factors are considered in determining whether to grant a preliminary injunction: (1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the

_____

2. It is worth noting that, although the cases did not discuss possible McCarran–Ferguson preclusion, this Court, and the District Courts in this Circuit, have routinely exercised jurisdiction over Lanham Act claims involving the insurance industry. See, e.g., U.S. Healthcare, Inc. v.
Blue Cross, 898 F.2d 914 (3d Cir. 1990); American Fidelity & Liberty Ins. Co. v. American Fidelity Group, 2000 WL 1385899, at *1 (E.D. Pa. Sept. 25, 2000); Guardian Life Ins. Co. v. American Guardian Life Assurance Co., 943 F. Supp. 509 (E.D. Pa. 1996).

3. We have appellate jurisdiction, although the order before us is interlocutory. 28 U.S.C. S 1292(a)(1) permits an appeal from an order granting an injunction.

nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest. ACLU v. Reno, 217 F.3d 162, 172 (3d Cir. 2000). Although it is not clear from its brief, UPMC seems to challenge only the District Court's finding that Highmark has a reasonable probability of succeeding on the merits. Accordingly, that is the only finding we will address.

The District Court found that Highmark has a reasonable probability of succeeding on the merits. To establish its Lanham Act claim, Highmark must show: (1) the defendant made false or misleading statements about the plaintiff 's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will. Breathasure, 204 F.3d at 91–92.

There are two ways to prove a false advertising claim under the Lanham Act. Either the advertisement must be literally false, or it must be literally true but misleading to the consumer. Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3d Cir. 1993). If an advertisement is literally false, the plaintiff does not have to prove actual consumer deception. Id. If, on the other hand, an advertisement is literally true but misleading, the plaintiff must prove actual deception by a preponderance of the evidence. Id. If a claim is literally true, a plaintiff " `cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react.' " Id. (quoting Sandoz Pharm. Corp. v. Richardson–Vicks, Inc., 902 F.2d 222, 228–29 (3d Cir. 1990)).

The District Court found nine separate claims made in the UPMC ad false and, in the alternative, misleading:

> (1) Reference to the Highmark plan as "CommunityBlue." The District Court found that "CommunityBlue" is in fact a service mark for three of Highmark's network plans, which includes "CommunityBlue Direct," the plan actually being offered to Allegheny County employees.

14

(2) Highmark provides service only in 10 hospitals in Allegheny County, as compared to 18 hospitals offered by UPMC. The Court found that Highmark actually offers the services of 16 hospitals, when rehabilitation and psychiatric facilities are included.4

(3) Highmark may send members to out-of-state hospitals for some types of care available in Allegheny County. The Court found that Highmark does not send subscribers to out-of-state hospitals for care available in Allegheny County.

(4) Doctors must obtain approval from Highmark before ordering some tests, admitting members to the hospital, and making other key medical decisions. The Court found that Highmark does not make medical decisions for its subscribers.

(5) UPMC does not limit self-referrals to its network specialists. The Court found that the $25 co-payment required by UPMC for such self-referrals is in fact a limitation. Further, the Court found that this representation implied that Highmark limits self-referrals; the Court found that Highmark did not.

The remaining four of the nine claims in the UPMC Ad that the District Court found false and misleading centered around the Ad's use of the word "access." The Ad claims that CommunityBlue Direct offers no access to specialty care at several named facilities, no access to several "world-renowned physicians," and no access to any services at Magee-Womens Hospital. The Ad also claims that CommunityBlue offers access to "only certain services" at Children's Hospital.

The District Court ruled that "access" has a plain meaning, applicable in this case. The Merriam-Webster Dictionary defines "access" as the "capacity to enter or approach." THE MERRIAM-WEBSTER DICTIONARY 23 (5th ed. 1997). The District Court's explanation on its face seems

_____

4. UPMC included rehabilitation and psychiatric facilities in determining the number of hospitals it offers.

15

appropriate, as the Ad was addressed to the public and not the industry. The District Court, using this plain meaning, determined that most of the Ad's claims relating to access were false and misleading because CommunityBlue Direct subscribers do indeed have access to the disputed facilities and world-renowned doctors, but at a lower level of benefits (that is, with additional out-of-pocket costs). UPMC argues that the Court should not have defined "access" according to its plain meaning, but rather should have looked to objective industry standards to construe the term.

According to UPMC, the objective industry standard definition of "access" is "access without additional cost to the subscriber." Under this definition, UPMC claims, its Ad is both literally true and not misleading. There is not enough evidence to determine whether UPMC in fact offers the objective industry standard definition.[5] There are decisions that support UPMC's contention that industry standards are relevant in determining whether the use of the term "access" was literally false. See, e.g., Castrol, 799 F. Supp. at 436 ("In order to determine whether a claim is literally false, courts have looked to objective industry standards rather than subjective standards of the party making the comparison."); Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., 915 F. Supp. 360, 365-66 (S.D. Fla. 1996) ("In making a threshold determination concerning the falsity of a challenged advertisement under the Lanham Act, examining the industry standard is appropriate."); American Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F. Supp. 1411, 1443 (E.D.N.C. 1986) ("In the view of the

_____

5. In arguing for its definition, UPMC points only to a previous advertisement by Highmark that similarly used the term "access." More evidence is needed to prove its definition is the objective industry standard. For instance, in addition to competitors' advertisements, the defendant in Illinois Bell Telephone Co. v. MCI Telecommunications Corp. produced employee testimony and definitions used by expert sources in the industry. 1996 WL 717466, *4 (N.D. Ill. 1996). In Castrol Inc. v. Pennzoil Co., the District Court heard expert testimony to help it determine the industry standard. 799 F. Supp. 424, 437 (D. N.J. 1992). One advertisement is not sufficient proof of an industry standard. However, we note that the burden of proving the objective industry standard definition rests on the plaintiff and not on the defendant. Id. at 436.

16

court, [objective industry standards] must be used in order to find a violation of the Lanham Act."). However, as there are several other claims in the Ad that support the District Court's granting the preliminary injunction, we need not decide this issue today.

We now review the facts considered by the District Court in determining that Highmark has a reasonable probability of success on the merits. We see no need to discuss each of the claims presented by Highmark, and limit ourselves to the most obviously deceptive.

The UPMC ad asserts that CommunityBlue Direct "[m]ay send members to out-of-state hospitals for some types of care available" in Western Pennsylvania. UPMC does not even argue that it has evidence that this takes place; instead, it argues that Highmark has the means and motive to direct patients to out-of-state hospitals. Means and motive are not sufficient to prove the statement true, and the District Court did not clearly err in finding this claim literally false.

The UPMC ad also asserts that UPMC does not "limit self-referrals to our network specialists." The District Court found that the $25 co-payment is indeed a limitation, and thus this claim is also literally false. This ruling likewise is not clearly erroneous.

Of most importance, the Ad asserts that CommunityBlue Direct provides "[a]ccess to only certain services at Children's Hospital." This claim is literally false, because Children's Hospital is actually part of the CommunityBlue Direct network. UPMC again argues that the claim is true, because Highmark has the "incentives and means to steer patients away from Children's Hospital." Without presenting evidence that Highmark is actually diverting patients from Children's Hospital, any incentives and means it may have to do so are irrelevant.

This assertion pertaining to Children's Hospital is of paramount importance because it speaks directly to the materiality and likelihood of injury components of Highmark's Lanham Act claim. As Judge Roth has noted, "[c]onsumer survey evidence is extremely helpful in determining whether an allegedly false statement is

17

material." Castrol, 987 F.2d at 954 (Roth, J., dissenting). Patricia Ann Liebman, the Chief Executive Officer of UPMC, testified that at informational meetings with the non-union employees of Allegheny County, the employees specifically asked questions about the Children's Hospital claim. Liebman also testified that Children's Hospital is an important institution for health plans offering services in Western Pennsylvania; a lack of access to the Hospital will influence the plan that employees with children will choose. In light of such testimony, the District Court did not err in finding the claim material or in finding that Highmark has a reasonable probability of succeeding on the merits. Accordingly, the District Court did not abuse its discretion in issuing the preliminary injunction. Moreover, on an application for preliminary injunction, the plaintiff need only prove a prima facie case, not a certainty that he or she will win. 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d S 2948.3.

B.

Before concluding, we turn to UPMC's argument that the District Court did not address -- unclean hands. UPMC argues that Highmark should be barred from bringing its Lanham Act claim because of the equitable doctrine of unclean hands. In July 1999, Highmark ran an advertisement in the Post-Gazette claiming to be the only health care plan offering "access" to five local hospitals ranked among America's best. UPMC claims that Highmark, having used the term "access" the same way UPMC did in the Ad before us, should not be heard now to complain about the UPMC ad. We reject this argument.

The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933). The doctrine is applicable in actions seeking relief under the Lanham Act. Ames Publ'g Co. v. Walker-Davis Publ'n, Inc., 372 F. Supp. 1, 13 (E.D. Pa. 1974). Courts, however, do not close their doors when plaintiff 's misconduct has "no relation to anything involved in the suit, but only for such violations of conscience as in

18

6. Thus, if we wish to, we can apply the doctrine. Harris v. City of Philadelphia, 47 F.3d 1333, 1342 (3d Cir. 1995); Gaudiosi v. Mellon, 269 F.2d 873, 881 (3d Cir. 1959).

some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." Keystone Driller, 290 U.S. at 245. The nexus "between the misconduct and the claim must be close." In re New Valley Corp., 181 F.3d 517, 525 (3d Cir. 1999).

Although we may sua sponte apply the doctrine,6 we choose not to do it. Highmark's inappropriate use of a term in its 1999 advertisement does not excuse current deceptive and misleading advertisements to the public.

IV. CONCLUSION

In summary, we conclude that the plaintiff offered sufficient evidence to prove that the challenged activities substantially affected interstate commerce. Highmark also established that the McCarran Act did not preclude relief under the Lanham Act for the deceptive and misleading representations in UPMC's February 2001 Ad. Finally, the District Court did not abuse its discretion in granting Highmark's application for a preliminary injunction. Costs taxed against the appellant, UPMC.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

19