Carl **LINGLE**; **Raymond Silverstein, As Trustee Under an Irrevocable Trust Dated April 1, 1993; Conwell Ltd., Partnership; Gerald Lehrfeld; Joan Lehrfeld; Jay Roseman; Lynn Roseman,**

v.

**PSB BANCORP, INC; First Penn Bank; Dilworth Paxson LLP. PSB Bancorp, Inc and First Penn Bank, Appellants,**

No. 04–2097.

United States Court of Appeals, Third Circuit.

Argued Sept. 23, 2004.

Decided Feb. 15, 2005.

Louis R. Moffa, Jr., (Argued), Ballard, Spahr, Andrews & Ingersoll, Voorhees, NJ, Arleigh P. Helfer, III, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Appellants.

David C. Burger, (Argued), Robinson Brog, Lienwand, Greene, Genovese & Gluck, New York, NY, for Appellees.

Arleigh P. Helfer, III, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Appellee.

Before McKEE, ALDISERT and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

PSB Bancorp, Inc. and First Penn Bank's (collectively "PSB") appeal from the district court's order granting summary judgment in favor of Carl Lingle, Hal Shaffer and Jerome Goodman (collectively "Standby Purchasers") and denying PSB's cross-motion for summary judgment. The primary question for decision is whether the Standby Options executed and issued by the First Bank of Philadelphia ("First Bank") were valid. The district court ruled that PSB did not "disclose any triable issues, and the facts, as presented, do not support [PSB's] contentions."

Appellants argue that the Standby Options were invalid because: (1) they were issued in violation of the Standby Purchase Agreement ("Standby Agreement"); (2) the Standby Purchasers attempted to mislead state and federal regulators and violated banking laws; (3) the Standby Purchasers' claims are barred by the doctrine of unclean hands; and (4) Lingle failed to obtain the proper regulatory approval. We have considered these arguments and all other contentions and will affirm.

Because we write only for the parties who are familiar with the facts and the proceedings in the district court, we summarize the facts briefly and limit our discussion to the major legal issues that control our disposition.

In 1994, the Federal Reserve Bank of Philadelphia informed First Bank that it needed to raise $4 million in capital or it would have to become acquired by another depository institution. In an effort to comply with this directive, First Bank decided to offer 16 million shares of common

stock to current shareholders of First Bank. If these shares went unpurchased, First Bank would offer the common stock to the public. To ensure that adequate capital was raised, the First Bank board voted to enter into a Standby Agreement in which any shares not purchased in the stock offering would be acquired by Standby Purchasers. Edward Barol, First Bank's lawyer, contacted Jerome Goodman, the former CEO of First People's Bank (subsequently CoreStates Bank), who in turn contacted Carl Lingle and Hal Shaffer. The Standby Purchasers entered into the Standby Agreement with First Bank on December 15, 1994, and agreed to purchase any additional shares not subscribed for in the offerings. The Standby Agreement provided that the additional shares would be issued to the Standby Purchasers.

In exchange for the Standby Purchasers' agreement to buy the additional shares, First Bank agreed to grant the Standby Purchasers the option to purchase an additional 16 million shares of First Bank common stock at $0.25 per share ("Standby Options"). According to the Standby Agreement, the Standby Options would be issued on or before February 2, 1995 ("Closing Date"). These Standby Options constitute the basis of this law suit.

We hold that the district court properly granted the Standby Purchasers' motion for summary judgment because there are no genuine issues of material fact as to whether the Standby Options were valid. Specifically, the district court did not err in ruling that: (1) the Standby Options were not issued in violation of the Standby Agreement; (2) the Standby Purchasers did not attempt to mislead regulators or violate banking laws; (3) the unclean hands doctrine is inapplicable; and (4) section 1409 of the Pennsylvania Banking Statute is not applicable to these proceedings.

## I.

■ The Standby Agreement was executed on December 15, 1994 and the Standby Purchasers posted a $4 million letter of credit naming First Bank as the beneficiary. (App. at 183–184.) In exchange for this commitment, the Standby Purchasers would receive the 16 million Standby Options on or before the Closing Date of February 2, 1995. (App. at 170–171.)

Paragraph 3 of the Standby Agreement provides that:

> The Standby Purchaser acknowledges and agrees that the Bank may decline to issue any of the Purchased Shares or options hereunder if, in the opinion of the Bank, the Standby Purchaser is required to obtain prior clearance of approval of such transaction from any state or federal bank regulatory authority and if such approval or clearance has not been obtained or if satisfactory evidence thereof has not been presented to the Bank by the Closing Date.

(App. at 172.)

PSB interprets this clause to mean that Lingle, the President of First Bank's board, should not have issued the Standby Options after the Closing Date because First Bank had the right to deny the options at those later times. PSB contends that Lingle acted out of self-interest in issuing the options, breaching his fiduciary duty to the First Bank shareholders. In its brief, PSB goes on to state that "[b]ecause PSB is the successor by merger to First Bank, PSB retains the right to rescind Lingle's improper issuance of the options after February 2, 1995." (Appellant br. at 16.)

There are two major problems with PSB's interpretation of this clause. First, as the district court correctly pointed out "[r]egardless whether FBP should have issued the options, it did so as an integral part of the Standby Purchase Agreement, which was approved by its board of directors." (App. at 6.) Prior regulatory approval was subsumed within the Standby Agreement, executed on December 14, 1994, well before the February 2, 1995 Closing Date. The Standby Agreement does not state that the First Bank Board had to approve the issuance of the Standby Options when the Options were actually delivered to the Standby Purchasers or third parties. (*See* App. at 171–172.) We conclude that approval of the whole Standby Agreement on December 14 satisfied paragraph three's requirement of "prior clearance of approval of such transaction from any state or federal bank regulatory authority."

■ Second, PSB's interpretation of paragraph three of the Standby Agreement would result in a partial rescission of the First Bank/PSB Merger Agreement. The Merger Agreement provided that the Standby Purchasers' Options "shall cease to represent a right to acquire shares of [First Bank] Common Stock and shall be converted automatically into an option to purchaser shares of PSB Common Stock ..." (App. at 305.) If PSB were to succeed in invalidating the PSB Options, it would evade its obligation to provide the shares of PSB Common Stock to the Standby Purchasers, resulting in a partial rescission of the Merger Agreement. Under Pennsylvania law, partial rescission of contracts is not allowed. *Keystone Helicopter v. Textron, Inc.,* 1999 WL 305517, 1999 U.S. Dist. LEXIS 7065, *9 (E.D.Pa. 1999). Furthermore, parties are ordinarily allowed to rescind their contractual obligations when they can be restored to sub-

stantially the same position they occupied prior to contract formation. *Fichera v. Gording,* 227 A.2d 642, 644, 424 Pa. 404 (1967). Because the Merger Agreement was executed in 1999, it would be extremely difficult to restore the parties to their pre-Merger positions.

Because there are no genuine issue of material fact as to whether Lingle issued the Standby Options in violation of the Standby Agreement, the district court correctly granted the Standby Purchasers' motion for summary judgment on this issue.

## II.

■ In accordance with the Standby Agreement, the Standby Purchasers directed that Goodman's options should be issued to different individuals. In its brief, the Standby Purchasers cited a letter in the appendix in which the Standby Purchasers requested that the Standby Options be issued in certain amounts to certain recipients. (App. at 463–464.) The letter also noted that if the Standby Options could not be issued as requested, they should be held in escrow pending receipt of the necessary approvals. First Bank issued the Standby Options as the Standby Purchasers directed, thus evidencing their consent. (Appellee br. at 50.) Accordingly, there are no genuine issues of material fact as to whether the Standby Purchasers violated the Standby Agreement by having Goodman's options issued to his family and friends.

## III.

PSB's contention that the Standby Purchasers attempted to mislead state and federal regulators by representing that Goodman would control less than 10% of First Bank is not supported by any evidence in the record. Although Appellants rely on documents on pages 140, 150 and

160 of the Appendix, these are unhelpful to their position.

## IV.

The Federal Change in Bank Control Act ("CBCA") requires a person acquiring control of a bank to give prior written notice to the appropriate Federal banking agency within sixty days of the change of control. *See* 12 U.S.C. § 1817(G) (2000). An acquisition of control is presumed to exist when, immediately after the transaction, the acquiring individual will own, control or hold 10% of any class of voting securities of the bank. 12 C.F.R. § 225.41(c)(2) (2003). We must decide whether this statute creates a private right of action.

To determine whether a statute provides a private right of action, a court must examine the statute in light of the four factors enumerated by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). These factors are: (1) whether the statute was enacted to benefit someone in the plaintiff's class; (2) whether there is any legislative intent to create a private remedy; (3) whether a private right of action is consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is traditionally relegated to state law. *Id.* at 78.

We conclude that PSB has no standing under the CBCA because we are persuaded that the reasoning of *Quaker City Nat'l Bank v. Hartley*, 533 F.Supp. 126, 128 (S.D.Ohio 1981), and its progeny is more persuasive than the teachings of *First Ala. Bankshares, Inc. v. Lowder*, No. CV–81–0325, 1981 WL 1638, at *10 (N.D.Ala. May 1, 1981).

Moreover, even if we determined that there is a private right of action under the CBCA, PSB has not raised any genuine issues of material fact in support of its contention that Goodman violated the Act. Other than PSB's bare assertion that Goodman transferred the options "in an effort to maintain control over the options while still appearing to have stock ownership of less than ten percent," (Appellants br. at 29), there is no evidence that Goodman violated the CBCA.

## V.

Under the Pennsylvania Change in Control Statute ("PCCS"), the Pennsylvania analogue to the CBCA, it is unlawful for an individual to acquire control of a company without the prior approval of the Department of Banking. *See* 7 P.S. § 112(B)(I) (2003). The term "acquire" means to acquire, directly or indirectly, a beneficial ownership of shares. *Id.* § 112(A)(I). A violation of section 112 may give rise to a private right of action for damages or injunction. *Id.* § 2105(b).

Here, regardless of whether or not Goodman violated the PCCS, there is no remedy available to PSB. PSB is seeking a declaration that the Standby Options were invalid; it is not seeking an injunction or damages. There is no remedy under the PCCS for declaratory relief.

## VI.

The doctrine of unclean hands is an equitable doctrine standing for the proposition that "he who comes in into equity must come with clean hands." *Precision Inst. Man. Co. v. Aut. Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The doctrine applies when a party seeking equitable relief has committed an unconscionable act immediately related to the equity the party seeks. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 161 (3d Cir.2001).

Here, the doctrine of unclean hands is not applicable because there are no genuine issues of material fact to support contentions that the Standby Purchasers "committed an unconscionable act immediately related to the equity the party seeks." *See id.* In its brief, PSB asserts that "Goodman and the other Standby Purchasers misled banking regulators as to the extent of Goodman's stake in First Bank at the time the regulators approved the Standby Purchase Transaction." (Appellants br. at 31.) There is no evidence in the record to support PSB's allegations that Goodman acted unconscionably. Because PSB cannot simply reassert factually unsupported allegations contained in its pleadings to overcome a summary judgment motion, the district court correctly ruled that the unclean hands doctrine is not applicable. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### VII.

■ Section 1409 of the Pennsylvania Banking Code provides that "... an institution may adopt and carry out a *plan,* approved by the department, for the sale of shares, or for the granting, with or without consideration, of options for shares, to some or all of the *officers* and *employees* of the institution ..." 7 P.S. § 1409 (emphasis added). One of the basic canons of statutory interpretation is that statutes should be interpreted to give meaning to each word. *United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955).

Here, PSB asks us to construe section 1409 liberally "to effect the legislature's intent." (Appellants br. at 38–39.) Such a construction is not necessary because the legislature's intent can be surmised by giving meaning to each word. Section 1409 refers to a *plan* for distributing shares to company employees and officers. The Standby Agreement does not constitute an employee distribution plan. It was a purchase agreement to save First Bank if any of its shares went unsold. That Lingle and Shaffer became officers of First Bank after the execution of the Standby Agreement is irrelevant. The Standby Agreement was not an employee distribution plan and the requirements of section 1409 do not apply.

■ Even if we ruled that section 1409 does apply, there are no genuine issues of material fact that Lingle violated it. The district court correctly noted that "[w]hen [PSB] contacted the Pennsylvania Department of Banking in 2000, they were informed that 'approval of the options as part of a plan was subsumed into the approvals that were granted by the Department for the change in control filing.'" PSB has not presented any evidence to indicate that the Department of Banking changed its opinion. Accordingly, there are no genuine issues of material fact that Lingle violated section 1409.

\*       \*       \*       \*       \*       \*

We have considered all of the arguments advanced by the parties and conclude that no further discussion is necessary. The judgment of the district court will be affirmed.